**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

**SUZANNE M. JEFFERSON,**

**Plaintiff,**

**v.**

**BRINER INCORPORATED,**

**AND**

**CARTERET MORTGAGE CORPORATION,**

**Defendants.**

**Civil Action Number 3:05-CV-652**

<u>**MEMORANDUM OPINION**</u>

This matter is before the court on: (1) the Defendant Carteret Mortgage Corp.'s Motion to Dismiss or for Summary Dudgment (docket entry nos. 6, 37 & 52); (2) the Defendant Briner, Inc.'s Motion to Dismiss or for Summary Judgment (docket entry nos. 33 & 50); (3); and the Plaintiff's Amended Motion for Summary Judgment (docket entry no. 54). There were numerous submissions in response and reply to all the motions. Instead of addressing each motion, the court presents herein the relevant facts and arguments pertaining to each cause of action in the amended complaint. Because summary judgment is deemed proper in this case for the reasons stated in favor of the Defendants as to all claims, all remaining issues and/or motions are rendered moot.

## Procedural History

The Plaintiff  initially filed an eight count Complaint against Briner, Inc. (Briner),

Carteret Mortgage Corp. (Carteret), and the Mortgage Store Financial, Inc.(Mortgage Store)[1]

alleging:  (1) violation of the Equal Credit Opportunity Act (ECOA) by all Defendants (Count I);

(2) violation of the Fair Credit Reporting Act (FCRA) by all Defendants (Count II); (3) violations

of the Truth in Lending Act (TILA) by all Defendants (Count III): (4) violation of the Virginia

Consumer Protection Act (VCPA) by all Defendants (Count IV); (5) breach of contract against

all Defendants (Count V); (6) actual fraud by all Defendants (Count VI); (7) constructive fraud

by all Defendants (Count VII); and (8) violation of the Real Estate Settlement Procedures Act

(RESPA) by all Defendants (Count VIII).

Carteret moved to dismiss all claims against it pursuant to Fed. R. Civ. P. 12(b)(6) for

failure to state a claim upon which relief could be granted.  (Carteret's Mem. Law Supp. Mot.

Dismiss Pl.'s Compl. at 2)(docket entry no. 6).   The Plaintiff was granted leave to amend her

Complaint (docket entry nos. 40 & 41), in response to which Briner and Carteret moved to

dismiss all claims upon the filing of the amended complaint.  (Docket entry nos. 33 & 38).  The

Amended Complaint (Complaint) alleged:  (1) violation of the ECOA (Count I); (2) violation of

the FCRA (Count II); (3) violations of TILA (Count III); (4) violation of the VCPA (Count IV);

(5) actual fraud (Count V); and (6) constructive fraud (Count VI) against Briner and Carteret.

The court considered the motions to dismiss and determined that they relied in part on matters

outside the pleadings, making a determination under Fed. R. Civ. P. 12(b)(6) improper.  Thus,

---

[1]Default was entered against the Mortgage Store on January 13, 2006, for failure to respond.
(Docket entry no. 27).

the motions were "treated as one[s] for summary judgment [to be] disposed of as provided in

Rule 56, and all parties [were] given reasonable opportunity to present all material made

pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b).  Order, March 10, 2006.

## Standard of Review

Courts generally may not consider matters outside the pleadings on a Rule 12(b)(6)

motion to dismiss.  However, if such matters are presented and the court is willing to consider

them, the motion may be converted to a motion for summary judgment as provided in Rule 56.

Finley Lines Joint Protective Bd. v. Norfolk Southern Corp., 109 F.3d 993, 995 - 996 (4th Cir.

1997)(citing cases).  When a court affirmatively exercises its discretion to convert a motion to

dismiss to one for summary judgment, as here, the standard of review changes from considering

whether a claim for relief has been stated, to whether there is no genuine issue of material fact in

dispute such that the moving party is entitled to judgment as a matter of law.  Id.

## Material Facts Not in Dispute

The court deems the following to be the relevant undisputed facts, and the reasonable

inferences to be drawn therefrom, upon which the pending motions are to be resolved:

1.   Briner operates as a mortgage banker, mortgage loan specialist, and broker.  (Pl.'s Am.
     Mot. Summ. J. (docket entry no. 54), letters attached as exs. C & T ).

2.   Carteret acted as a mortgage broker in the transaction at issue in this case.  (Def. Carteret
     Mort. Corp.'s Supp'l Mem. (docket entry no. 52), Hagerty Aff. ¶¶ 4-5).

3.   The Plaintiff, Suzanne Jefferson (Jefferson), is a licensed real estate broker who was in
     contact with Ralph T. "Jay" Johnson, a Briner employee, at the time of relevant events
     regarding a matter not related to this case.  Jefferson and Johnson discussed Jefferson's
     interest in obtaining mortgage financing to purchase or build a residence.  (Pl.'s Dep. at
     176; Johnson's Dep. at 16; letter from Mercer to McCollum, undated, attached as ex. C to
     Pl.'s Mem. Supp. Summ. J.).

4.    Jefferson authorized Johnson to inquire into her credit status in regard to the mortgage financing that she sought.  (Pl.'s Dep. at 78, 176).  Accordingly, Johnson accessed Jefferson's credit report on June 6, 2004, disclosed the report to her, and discussed a loan program that he understood at the time was available based on Jefferson's credit score. (Mercer Dep. at 32; Pl.'s Dep. at 78, 177; Johnson's Dep. at 17).

5.    On June 13, 2004, Briner provided Jefferson with a conditional loan pre-approval letter and began assisting Jefferson in a search for finding financing of the loan.  (Def. Carteret Mort. Corp.'s Supp'l Mem., ex. 2 ¶ 11; Pl.'s Dep. at 21, 40).  On July 3, 2004, Johnson wrote a letter "to certify that [Jefferson] has been approved with Briner, Incorporated Mortgage Bankers . . . Loan processing will begin upon receipt of a ratified sales contract. *Final approval will be . . . after verification of documentation provided by the borrower, clear title history and a positive appraisal review supporting the sales price . . . ."*  (Pl.'s Am. Mem. Supp. Summ. J., ex. E) (emphasis added).

6.    However, Johnson thereafter retracted his earlier representation that Jefferson would qualify for a loan from Briner and informed her that Briner could not, in fact, extend her a loan based on her credit score.  (Johnson Dep. at 18).

7.     The President of Briner, Patricia Mercer, subsequently wrote to Melissa McCollum at the State Corporation Commission, that:  "[i]n his zeal to assist Ms. Jefferson, Jay [Johnson] provided an approval letter on Briner, Incorporated letterhead in error, said letter being due in reliance on verbal communication from someone he considered a lending professional."  (Letter from Mercer to McCollum, undated, attached as ex. C to Pl.'s  Mem. Supp. Summ. J.).

8.    Johnson informed Jefferson that he thought she could nevertheless qualify for a 100 percent conventional loan through Carteret.  (Johnson Dep. at 18, 38).

9.    Jefferson submitted a loan application to Carteret on July 16, 2004, and Carteret obtained Jefferson's credit report on the same date.  (Pl.'s Dep. at 87; Ramos Aff. ¶¶ 5-6).

10.    Jefferson received and signed a Truth in Lending form on July 16, 2004, that she had received in a package of materials from Carteret when she submitted her application on the same date.  (Pl.'s Dep. at 144-45, 187; ex. 16 to Pl.'s Dep.).

11.    Among the documents Jefferson signed in connection with her loan application was a Borrower Certification & Authorization (Certification). (Def. Carteret Mort. Corp.'s Supp'l Mem., ex. 5). The Certification confirmed that Jefferson had applied for a loan with Carteret.  (Hagerty Dep. at 51).  The Certification specifically provided that:  "I/We have applied for a mortgage loan which CARTERET MORTGAGE CORPORATION is helping to arrange," and that "part of the application process, CARTERET MORTGAGE CORPORATION may verify information contained in the loan application and in other

4

documents required in connection with the loan," and that Jefferson authorized Carteret to "verify my past and present employment earnings records, bank accounts, stock holdings, and any other asset balances that are needed to process my mortgage loan application. . . to order a consumer credit report and verify other credit information . . . only to be used in the processing of my application for a mortgage loan."   (Def. Carteret Mort. Corp.'s Supp'l Mem., ex. 5).

12.    As a mortgage broker, Carteret processes loan applications "to find a lender that we think best meets the needs of the applicant, get [the consumer] the best rate that we can get." (Hagerty Dep. at 53).

13.    Carteret sent Jefferson's loan application the Mortgage Store.  (Ramos Aff. ¶ 9).

14.    Jefferson maintained contact with Carteret through its employees, Josie Ramos and James Hagerty.  (Pl.'s Dep. at 70-71).  Ramos wrote a letter, dated October 1, 2004, stating that she acted as a broker for Jefferson and that the credit inquiries of June 6, July 7 ,  July 15, August 18, and September 17, 2004, were made by "different lenders who could have possibly funded the loan." (Ramos letter of 10/1/2004, attached as ex. R to Pl.'s Am. Mem. Supp. Mot. Summ. J.).

15.    Jefferson was informed that she had received conditional pre-approval for mortgage financing from the Mortgage Store on or about July 26, 2004.  (Pl.'s Dep. at 139-40).

16.    The settlement/closing date for the purchase of the subject property was to be on or about August 20, 2004.  (Pl.'s Dep. at 146).

17.    Jefferson knew, that as a general matter, any application for additional credit that is made during the pendency of a credit application by or on behalf of the applicant can have an adverse impact on the applicant's credit score, but she nevertheless applied for a business loan and personal credit while her mortgage loan application was pending. (Pl.'s Dep. at 137-38).

18.    There were some nine instances during the relevant time frame in which Jefferson's credit report was accessed by various sources, only two of which were authorized by Jefferson. (Pl.'s Dep. at 102).

19.    On September 14, 2004, the Mortgage Store decided not to extend Jefferson a loan, in part, because her credit score was no longer high enough to support the mortgage loan she had sought.  (Denial Notice of 9/20/2004, attached to Def. Carteret Mort. Corp.'s Supp'l Mem. as ex. 7.).  The Mortgage Store sent two denial notices to Josie Ramos at Carteret which were not forwarded to Jefferson.

20. Despite its characterization and argument to the contrary, as a mortgage broker, Carteret formally participates in a lender's decision to grant or deny credit as it did with the Mortgage Store's ultimate decision not to extend a loan to Jefferson. (Hagerty Aff. ¶¶ 6 - 9).

21. An appraisal of the property was conducted as reflected in a report prepared on September 16, 2004, and signed in approved form on September 21, 2004. (Court ex. 1).[2]

22. The appraisal report was forwarded to Carteret on September 21, 2004, but there is no direct evidence it was also forwarded to Briner. Id.

23. Although she had not personally seen any appraisal, Jefferson nevertheless believed that Johnson was in possession at some stage in the process of an appraisal of the property that Jefferson planned to purchase. (Pl.'s Dep. at 139-40).

24. A series of closing documents, including a title policy with endorsements indicating no restrictions or limitations with regard to title, was faxed to Carteret on September 14, 2004, with a copy also being forwarded to Johnson at Briner. (Court ex. 2).

25. A credit report, dated September 20, 2004, indicated that as of that date, there had been a total of three mortgage-related inquiries as to Jefferson's credit. (Def. Carteret Mort. Corp.'s Supp'l Mem., ex. 8). The Report indicates that there were a total of nine credit inquiries, the remaining six of which were unrelated to the mortgage loan application. (Def. Carteret Mort. Corp.'s Supp'l Mem., ex. 1 at 95-97, 100, 153-54).

## Analysis

Count I – ECOA

In Count I of the Complaint, Jefferson alleges that the Defendants violated the ECOA by failing to provide Jefferson with any written statement of reasons for the denial of credit as well as the additional disclosures required by 15 U.S.C. §1691(d). In order to state a violation under 15 U.S.C. §1691(d), a plaintiff must demonstrate that the defendant(s) denied or terminated the plaintiff's credit and failed to provide proper written notice of the adverse action. The ECOA was originally enacted to address discrimination in any aspect of any credit transaction by

---

[2]The appraisal was conducted by an individual with the last name of Johnson, but it is not the same person as the Briner employee with the same last name.

requiring disclosure from the qualifying "creditor" of the reason(s) for any credit denial.[3]  15

U.S.C. § 1691(a).  For purposes of the statute, "'creditor' means *any person who regularly*

*extends*, renews, or continues credit; *any person who regularly arranges for the extension,*

*renewal, or continuation of credit*; or any assignee of an original creditor who participates in the

decision to extend, renew, or continue credit." Id. (emphasis added).

Carteret argues that the ECOA claim must fail because it is not a creditor as defined by

ECOA and that  there was no completed application as required for its applicability.  (Def.

Carteret Mort. Corp.'s Mem. Law Supp. Mot. Dismiss Pl.'s Compl. at 5, 8 (Carteret's Mem.

Mot. Dismiss); Def. Carteret Mort. Corp.'s Supp'l Mem. at 9 (Carteret's Supp'l Mem)).

Although Briner does not contest that it was a "creditor" within the purview of the ECOA, it

argues that it is not liable for any ECOA violation because Jefferson has failed to demonstrate

that she completed an application which is a necessary prerequisite to implicate the ECOA.

Carteret argues that "when an entity is merely 'shopping' a credit application to potential

lenders, that entity is not a 'creditor,' and therefore it has no reporting obligations under the

ECOA."   (Carteret Supp'l Mem. at 9, citing Treadway, 362 F.3d at 979-80; and Padin v. Oyster

Point Dodge, 397 F.Supp.2d 712 (E.D.Va. 2005)).  This court in Padin relied on the Seventh

Circuit's reasoning in Treadway to find that when a car dealer merely selects a lender to whom to

send an application for financing, that act *alone* does not automatically transform the dealer into

a "creditor" subject to the ECOA.  Padin, 397 F.Supp.2d at 718.  A car dealer's primary business

---

[3]Carteret suggests that ECOA and related authority only applies to allegations of discrimination not present here.  (Carteret Supp'l Mem. at 10).  The act has clearly been extended to all credit transactions, whether discrimination is alleged or not, to ensure that credit is not denied for any improper reason.  Treadway v. Gateway Chevrolet Oldsmobile Inc., 362 F.3d 971, 979-80(7th Cir. 2004).

is to sell vehicles, and it may offer as an auxiliary function in order to aid in that objective, the ability to extend credit or to assist in arranging for credit financing.  The car dealer in <u>Padin</u> did more than just "shop around" the consumer's application for financing.  The dealer, in fact, "extended" part of the credit to its customer by adding an amount on to the base finance charge of the lender to finance or otherwise compensate for its assistance in arranging for the financing.  As such, the dealer qualified as a "creditor" under the ECOA.  <u>Id</u>.

A mortgage broker's primary business is to regularly arrange for financing for its clients for which, presumably, it charges a fee.  Contrary to the suggestion of counsel during oral argument, the motivation of the mortgage broker in arranging for financing is at least the same as the car dealer, if not greater, where it is the mortgage broker's sole objective.  While there is no specific evidence in the record as to what Carteret expected to gain from its efforts on behalf of Jefferson, it is reasonable to infer that like the car dealer in <u>Padin</u>, the amount financed included, or otherwise took into account, Carteret's charge for its services.  In any event, the Certification specifically states in pertinent part that Carteret was "helping to arrange" financing for Jefferson, therefore, it participated in the process that led to the lender's decision whether to extend credit.  (Findings ¶¶ 11, 20).  Moreover, the efforts undertaken by Carteret in actively advocating on behalf of its clients (to "find a lender that [they] think best meets the needs of the applicant") otherwise falls within the continuum of participation that involves more than just "shopping around" an application for credit.  (Finding ¶ 12); <u>Treadway</u>, 362 F.3d at 980.  Accordingly, Carteret qualifies as a "creditor" for purposes of analyzing Jefferson's ECOA claims against it because it is a mortgage broker as specifically identified in the ECOA and it participated in the

decision to grant or deny credit.  It remains to be determined, however, whether there was a completed application subject to the strictures of the ECOA.

As noted by Briner, § 1691(d)(1)'s notification provision is triggered only upon a creditor's processing of a "completed application for credit."  15 U.S.C. § 1691(d)(1).  Briner asserts that Jefferson cannot demonstrate with sufficient particularity that it ever received a "completed application" because Briner specified, in initially providing conditional approval, that it required verification of clear title and a positive appraisal to support the purported sale price of the subject property before the application would be deemed completed.[4]

Jefferson argues that she completed an application for Briner, that Briner approved the loan, and in reliance on such approval, she entered into a contract to purchase a residence for

---

[4]Briner also argues that Jefferson is the type of "sophisticated borrower" as in Howard Oaks v. Md. Nat'l Bank, 810 F. Supp. 674, 678 (D. Md. 1993), who must be held to some stricter standard because, as a licensed Virginia realtor, she should have known that she had not submitted a completed application.  However, Howard Oaks does not support the Defendants' arguments that Jefferson's claims are fatally flawed because she was a "sophisticated borrower."  810 F.Supp. At 677.  First, while the Howard Oaks court found that the complaint there established that the plaintiff in that case was a "sophisticated creation of a sophisticated businessman," the court evaluated his reliance on fraudulent inducements  that were involved as being "unreasonable as a matter of Maryland law."  Id.  The decision was therefore based on Maryland law, which is neither binding nor relevant here.  Further, the Howard Oaks court dismissed that plaintiff's ECOA claim for failure to allege that there was a completed application involved because the court found that the plaintiff had, in fact, admitted there had been no formal application but, instead, that the plaintiff had relied on "'additional information in the form of letters and documents.'" Id. at 678.  Accordingly, the court did not hold, as the Defendants here argue, that an allegation of a completed application was a pleading requirement, but instead that the plaintiff there could never allege a completed application because it had admitted that the process was never completed.  Id.  This court otherwise finds the Complaint here, as amended, to be sufficient to comply with the basic pleading requirements of Fed. R. Civ. P. 8(a) in providing "a short and plain statement" of Jefferson's ECOA claim where it can at least be fairly inferred that it is premised on the denial of credit in a completed process.

which an appraisal and proof of clear title was available.[5] ( Pl.'s Am. Mem. Supp. Summ. J. at 2-3).  Jefferson also argues that summary judgment is proper against Carteret because she completed a form 1003 Uniform Residential Loan Application for Carteret, signed all necessary documents, and that a property appraisal was forwarded to Carteret employee Josie Ramos to complete the application process on or about September 21, 2004 (Johnson Realty appraisal invoice, attached as ex. F to Pl.'s Am. Mem. Supp. Summ. J. and introduced as Court ex. 1 during oral argument).

The term "completed application" has been defined as "an application in connection with which a creditor has received *all the information* that the creditor regularly obtains and considers in evaluation applications for the amount and type of credit requested (including, but not limited to, credit reports, any additional information requested from the applicant, and any approvals or reports by governmental agencies or other persons that are necessary to guarantee, insure, or provide security for the credit or collateral)."  12 C.F.R. § 202.2(f) (emphasis added).  Under Regulation Z, a creditor is permitted to determine its own application process, including the type and amount of information it will request to consider an application complete.

This case demonstrates, however, that there is such latitude among lending practices and procedures that the concept of finality in the application process is elusive at best.  Loan documents generally, and those in this case, use qualifying language in the earlier stages of the process such as noting a loan application is "conditionally pre-approved" or that the borrower is

_____

[5]Presumably, the purpose of "pre-approval" for financing is to permit the potential borrower to utilize same in contracting for the purchase of the objective of the financing.  However, at the same time, it is fair to infer that the borrower would condition any purchase contract on the contingency[ies] specified by any conditional pre-approval of the financing.

"conditionally pre-qualified" that are susceptible of misinterpretation.  Even experienced professionals in the industry acknowledge that such nomenclature can be confusing.  (Letter from Mercer to McCollum, undated, attached as ex. C to Pl.'s  Mem. Supp. Summ. J.).

Nevertheless, a review of the documents in this case reveals a factual sequence that clarifies the matter.  First, Briner almost immediately retracted its initial "pre-approval" and informed Jefferson that it would not, in fact, extend a loan to her.  (Johnson Dep. at 18). Jefferson admits as a result that she knew, as of that stage in the process, that Briner was not going to extend her a loan.  (Pl.'s Dep. at 18).  Furthermore, although the appraisal report  (Court ex. 1), which was one of the conditions of the earlier "pre-approval," was provided on or about September 21, and even though it was a positive appraisal in the sense that it supported the purchase price of the subject property, the document was sent to Carteret without any evidence it was also forwarded to Briner.  In addition, as to the second condition of Briner's pre-approval, the title documentation (Court ex. 2) was not received by Briner until long after its retraction of pre-approval and on the same day of rejection by the Mortgage Store.  (Findings ¶¶ 5-6, 10, 24). Therefore, there was no completed application prior to Briner's decision to deny the loan and there can be no resulting claim against Briner under the ECOA.   With respect to Carteret, it appears that the appraisal was provided to Carteret at the earliest on September 22, 2004.  (Court ex. 1).  Meanwhile, the Mortgage Store, to which Carteret had referred Jefferson's application, had already foreclosed the possibility of financing on September 20, 2004. (Finding ¶ 12).

Despite the initial, tentative representations by Briner and Carteret that Jefferson would be able to obtain financing, the court cannot interpret the relevant evidence as involving a

completed application, given that the stated conditions were not complied with within the relevant time period of the application process.[6]

II.     FCRA

Jefferson alleges that Carteret and Briner repeatedly accessed her credit history without authorization, thus causing her credit score to be lowered to a point that contributed to her not ultimately qualifying for the loan she sought.  The ECOA and the FCRA are similar in that they both require notice to be given to consumers when a request is made by a creditor or a "user" to a consumer reporting agency to provide a consumer report and, then, an "adverse" action is taken by the creditor.  15 U.S.C. §§ 1681a(k),1691(d).   However, ECOA and FCRA differ in purpose, coverage, and remedy.  The FCRA is more circumscribed in that it was enacted to ensure that consumer reporting agencies – not all creditors – exercise care and "adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance [with the Act]."  15 U.S.C. §§ 1681(a)-(b).  While Carteret is clearly a creditor for purposes of the ECOA because it is specifically identified in the statute and it participates in the credit decision, the ECOA definitions do not extend to the FCRA.

---

[6]The situation would presumably be different if the conditions for final approval were added after the stage of pre-approval whereby it could be persuasively argued that there was a completed application because the pre-approval was not conditioned on the receipt of any additional information.  The court is, in any event, discouraged by the failure of the mortgage lending industry, and/or the legislative branch, to clarify the situation as to what is meant by, and included in, the "pre-approval" process.

Carteret argues that Jefferson has produced no evidence to support her claim that Carteret accessed her credit report more than once on July 16, 2004, when she submitted the loan application to Carteret.  (Pl.'s Dep. at 99, 103).  In addition, Carteret argues that even though it did access Jefferson's credit report at that time, it is entitled to summary judgment because Jefferson authorized it to do so, the FCRA permits such a legitimate "pull," and Carteret did not take any adverse action requiring notice.[7]   (Finding ¶ 4).

Jefferson acknowledges that Carteret only accessed her credit report on the date that she submitted her loan application to Carteret (July 16), and that it did so with her permission.  (Pl.'s Dep. at 83-84).  Specifically, in executing the Certification form, Jefferson explicitly authorized Carteret to access a great deal of information about her, including her credit report.   (Carteret's Supp'l Mem., ex. 5).[8]  Moreover, under 15 U.S.C. § 1681b(a)(3)(A), a mortgage broker such as Carteret is permitted to access a consumer's credit report either "in connection with a credit transaction involving the consumer . . . . and involving the extension of credit to the consumer," or under 15 U.S.C. § 1681b(a)(3)(A) for "a legitimate business need for the information in connection with a business transaction that is initiated by the consumer."

---

[7]Jefferson concedes that the disclosure provisions of § 1681g(g) were not in effect when the events giving rise to the claim occurred, and thus Jefferson's additional claim in Count II that failure to make such disclosures violates the FCRA must fail.  (Pl.'s Reply Mem. to Def. Carteret Mort. Corp.'s Mot. Dismiss at 8).

[8]To the extent that the arguments from Carteret's Motion to Dismiss may still be advanced, Carteret also argued that Jefferson cannot maintain a claim against it because a private right of action is no longer available to a plaintiff under § 1681m as the result of amendments enacted in 2003.  In a comprehensive opinion, this court recently rejected the argument that the 2003 amendment to § 1681m abolished a private right of action to remedy noncompliance with that section.  Barnette v. Brook Road, Inc., Civ. Action No. 3:05CV590 (E.D.Va. May 3, 2006)(Lauck, J.).

Carteret also argues that it did not take any adverse action as defined by 15 U.S.C. § 1681m(a)(1) so as to require it to provide any separate or additional notice their that provided by The Mortgage Store.

> If any person take any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall – (1) provide oral, written or electronic notice of the adverse action to the consumer . . . .

While it is established that Carteret participated in the credit decision made by The Mortgage Store so as to qualify it, in part, as a creditor for purposes of applying the ECOA, there is nothing alleged or as presented in regard to the motion for dispositive relief to indicate that it declined to extend financing to the Plaintiff or that it was involved in The Mortgage Store's decision to decline financing based on its review of Jefferson's credit report.  (Pl.'s Dep. at 118; Hagerty Aff. ¶¶ 4-5).  Therefore, Carteret is entitled to judgment on Count II.

Jefferson also consented to Briner accessing her credit history in order to assist in obtaining a mortgage, and therefore Briner obtained the report for a permissible purpose pursuant to 15 U.S.C. § 1681b(a)(3)(A).  In regard to Carteret, Jefferson has not demonstrated that Carteret accessed her credit for anything other than a permissible purpose.  Furthermore, Jefferson admits that Briner orally informed her of the adverse action that it would not extend her a loan.  (Pl.'s Dep. at 49, 176; Johnson's Dep. at 18).  Briner has therefore also demonstrated that not only did it have Jefferson's express permission to access her credit report, but it accessed the report for a legitimate purpose, and provided Jefferson with notice of its decision.  Therefore Briner is entitled to judgment on Count II.

III     TILA

Jefferson alleges that Carteret violated TILA for failing to make required disclosures.  In order to prevail on a claim for a violation of 15 U.S.C. § 1638, and Regulation Z, 20 C.F.R. § 226.1, *et seq.*, a plaintiff must demonstrate that the creditor failed to accurately state any one of the required disclosures such as the amount financed, the total number of payments, the finance charges, the annual percentage rate, the identity of the creditor, and an itemization of the amount financed.  A creditor must make the disclosures early and conspicuously in writing, in a form the consumer may keep, and it must do so before the credit is actually extended. 12 C.F.R. § 226.17(a)(1)(b).  A credit contract is consummated when a consumer signs a credit contract that binds the consumer to the credit terms. Compton v. Altavista Motors, Inc., 121 F.Supp. 2d 932, 936 (W.D.Va. 2000).  Regulation Z requires that these disclosures must properly "reflect the terms of the legal obligations of the parties" and where the creditor is uncertain of the terms, the creditor is required to clearly state that the disclosure is an estimate and the estimate must be based on information reasonably available at that time.  12 C.F.R. § 226.17(c)(1)-(2).

Carteret argues that it is not a creditor as defined by the statute because Jefferson cannot prove that Carteret is a creditor "who both (1) regularly extends . . . consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement." 15 U.S.C. § 1602(f); 12 C.F.R. § 226.2(a)(17)(I). To establish her TILA claim, Jefferson must demonstrate *both* that Carteret regularly extends consumer credit, and that Carteret was the entity to whom she was to become indebted.  Here, Jefferson has admitted that she never received any document that indicated Carteret was to be the

15

entity that would be receiving loan payments from her, nor was there any documentation Carteret

was to be the payee of any mortgage to be paid by Jefferson.  (Pl.'s Dep. at 39); <u>Moore v.</u>

<u>Flagstar Bank</u>, 6 F.Supp.2d 496, 502-503 (E.D.Va. Nov. 26, 1997)(holding that even where there

was a fact question whether the broker regularly extended credit, there was no TILA violation

where the indebtedness was to a bank, not the broker).  Therefore, Carteret is entitled to

judgment on Jefferson's TILA claim, as well as Briner, because Jefferson not only admits she

received a TILA disclosure from Briner (as part, apparently, of a standard loan application

package), but also that no transaction was ever consummated between her and Briner so as to

activate TILA requirements.[9]  <u>Scroggins v. LTD, Inc</u>., 251 F.Supp.2d 1277 (E.D. Va. 2003).

IV.   VCPA

Jefferson alleges that the Defendants violated the Virginia Consumer Protection Act,

(VCPA), Va. Code Ann. § 59.1-200, *et seq*., and, specifically, § 59.1-200(A)(14), in one or more

of the following ways: (1) by misrepresenting that Jefferson had been approved for financing for

the purchase of the residence; and (2) by engaging in the deceptive practice of representing to her

that her loan had been approved while knowing that she had in fact not yet been approved

without the intent to deliver as promised and/or with knowledge that they had no idea whether in

fact Jefferson would be approved for financing. (Pl.'s Am. Mem. Supp. Summ. J. ¶ 49 (docket

entry 54); Pl.'s Reply Mem. to Def. Briner's Mot. Dismiss ¶ 39-41 (Briner's Mem. Mot.

Dismiss)(docket entry no. 42)).

---

[9]Carteret also argues the TILA claim is time-barred because the case was not filed until
September 19, 2005, which is "more than a year after her application to Carteret." (Carteret's Supp'l
Mem. at 20).  It is not necessary to determine when Jefferson's claim accrued, and when the
limitations period expired, because she fails to demonstrate that Carteret was a creditor to whom any
indebtedness was owed in the first instance.

Virginia Code Ann. § 59.1-200(a)(14) makes it unlawful to use any deception, fraud , false pretense, false promise, or misrepresentation in connection with a consumer transaction.  To state a claim under the VCPA, a plaintiff must allege a fraudulent misrepresentation of fact. Lambert v. Downtown Garage, Inc., 553 S.E.2d 714, 716 (Va. 2001).  An allegation of a misrepresentation of fact "must include the elements of fraud: a false representation, of material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage."  Weiss v. Cassidy Dev. Corp., 63 Va. Cir. 76 (2003).  Additionally, the plaintiff "must allege facts with requisite specificity, including identification of agents, officers and employees of the entities who are alleged to have perpetrated the fraud and the details of time and place of the fraudulent acts."  Id.

Jefferson contends that Carteret and Briner violated the VCPA by misrepresenting to her that she had been approved for financing for the purchase of the residence when, in fact, they knew that she had not been approved, that they had no intention of delivering to her the loan promised, or they had "no idea whether in fact Plaintiff would be approved for the financing." (Am. Compl. ¶ 44).  Carteret argues that Jefferson has admitted that no one at Carteret communicated with her – either orally or in writing – that she had been approved or would be approved for a mortgage loan and that her claim is actually that Johnson, a Briner employee, was acting as Carteret's agent for the purpose of asserting the VCPA and fraud claims.  (Pl.'s Dep.  at 71-74).  Carteret argues that Jefferson has no evidence that Johnson was an agent of Carteret, and

thus it is entitled to judgment on the VCPA claim because Jefferson admits that Carteret made no representations directly to her.[10]

Briner argues that it is entitled to judgment because Jefferson admits that it was never represented to her, nor did she ever understand, that Briner would be funding a mortgage loan so that she could purchase the property. (Pl.'s Dep. at 49). Briner further argues that any statement made by its agent, Johnson, that Jefferson was pre-approved for a mortgage loan based on her credit score was simply an unfulfilled promise or reference to a future event, neither of which constitute the basis for fraud. A&E Supply Co. v. Nationwide Mut. Fire Ins. Co., 798 F.2d 669, 672 (4th Cir. 1986).

Briner also argues that the Defendants are entitled to judgment on the claim because the VCPA specifically contains a provision that excludes from its coverage "[b]anks, savings institutions, credit unions, small loan companies, public service corporations, *mortgage lenders as defined in §6.1-409, broker-dealers as defined in § 13.1-501*, gas suppliers as defined in subsection E of § 56-235.8, and insurance companies regulated and supervised by the State Corporation Commission or a comparable federal regulating body." Va. Code Ann. § 59.1-199 (emphasis added). A "Mortgage lender" is defined as any person who directly or indirectly originates or makes mortgage loans. Va. Code Ann. § 6.1-409. Both Briner and Carteret therefore fall within the definition of mortgage lender as defined in Va. Code Ann. § 6.1-409. Therefore, Briner and Carteret are entitled to judgment on the VCPA claim because mortgage

---

[10]Carteret also argued in its motion to dismiss that the VCPA was insufficiently pled because Jefferson failed to state with particularity how Carteret violated the multi-faceted statute. Although there are certain pleading standards embodied by Fed. R. Civ. P. 8 and 9(b), the court finds that the Complaint satisfies the requirements to plead the basic circumstances underlying the allegations of fraud for both Carteret and Briner, as well as the VCPA, thereby withstanding dismissal.

lenders are exclusively regulated by the State Corporation Commission and not subject to oversight by private parties in an action such as this. *See* <u>Cetto v. Wilshire Credit Corp</u>., No. 05-19, 2005 U.S. Dist. LEXIS 8160, at *2 (E.D. Va. April 22, 2005).

V.     Actual Fraud

Jefferson has also alleged that Briner and Carteret knew that no lender had approved financing for her purchase, and yet they "intentionally misrepresented that they had secured a loan for Plaintiff in order to obtain her agreement to do business with them, and with the knowledge that Plaintiff would rely on the misrepresentation and seek to purchase a home as a result of her loan approval."  (Am. Compl. ¶¶ 50-51).   Relying on the misrepresentation to her detriment, Jefferson asserts that she then entered into a contract to purchase a residence and suffered monetary losses as a result of the transaction's failure for lack of funding.  <u>Id</u>.

As previously noted, a plaintiff must prove a claim for actual fraud by clear and convincing evidence that the offending party made:  (1) a false representation; (2) of a material fact; (3) intentionally and knowingly; (4) with the intent to mislead; (5) reliance by the party misled; and (6) resulting damage by the party misled.  <u>Weiss</u>, 63 Va. Cir. 76.   Carteret essentially relies on its argument that Jefferson did not communicate directly with Josie Ramos or James Hagerty, and thus "Plaintiff's claim of actual fraud must be summarily dismissed." (Carteret Supp'l Mem. at 26).   At the same time, Briner essentially relies on its assertion that "Plaintiff did not believe that Briner was funding her loan," and that Johnson's assurances that Jefferson qualified for a loan with a lender was nothing more than an unfulfilled promise or future event that could not be relied on to constitute fraud.   (Def. Briner, Inc., Rule 56 Evid. in Further Supp. Mot. Dismiss at 8)(Briner's Supp'l Mem.)

Even assuming that Jefferson's version of the facts is correct, a fraud claim cannot be maintained on the basis of representations that are "predicated on unfulfilled promises or [constitute] statements as to future events." A&E Supply Co., 798 F.2d at 672; Am. Compl. ¶¶ 15 -17. Jefferson's version of the relevant facts is that Johnson told her that her loan was approved, the Mortgage Store issued a "Conditional Loan Pre-Approval," and that all she needed to complete the loan process was an appraisal and proof of clear title. (Am. Compl. ¶¶ 15, 17). While the parties apparently dispute the significance of what was meant by "Conditional Loan Pre-Approval," it is clear that the loan could not be consummated, nor the application process completed, until the lender had received an appraisal and evidence of clean title. Therefore, the representations of pre-approval could not constitute misrepresentations of present fact on which a fraud claim could be based because final approval depended on future events. A&E Supply Co., 798 F.2d at 672.

VI.     Constructive Fraud

Jefferson finally alleges that Briner and Carteret negligently misrepresented that they had secured a loan for her to purchase the residence so as to constitute at least constructive fraud. (Am. Compl. ¶¶ 54-55). Carteret advances the same arguments in defense of the constructive fraud claim as it does in regard to the actual fraud claim because Jefferson admits that Carteret made no representations directly to her. (Carteret Supp'l Mem. at 27). Also, in its motion to dismiss, Carteret argues that recovery under a theory of constructive fraud is barred by the economic loss doctrine. Mortarino v. Consultant Eng'g Servs. Inc., 467 S.E.2d 778, 782

(1996).[11]  Briner also contends that the representations made to Jefferson by Johnson were, at

most, unfulfilled promises or promises based on future events.  (Briner's Supp'l Mem. at 8).

Neither Carteret nor Briner could be liable for the representation of a fact that was based on a

future event – such as the requirement for the future receipt of an appraisal and proof of clear

title.  For the same reasons as discussed in the preceding section, Briner and Carteret are entitled

to judgment on the constructive fraud count as well.  A&E Supply Co., 798 F.2d at 672.

## Conclusion

Presumably, Jefferson would have conditioned her execution of the contract for the

purchase of the subject property for which she was seeking financing on the same contingencies

as were involved in the qualified pre-approval of the financing.  Perhaps she did not and, if so,

that would have been the cause of any damages she may have suffered in conjunction with the

failure of the purchase contract.  In any event, for the reasons stated, dispositive relief must be

GRANTED to the Defendants.

An appropriate order shall issue.

It is so ORDERED.


_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge

---

[11]Because the Constructive Fraud claim fails for the reasons set forth, it is not necessary to discuss the economic loss doctrine.  However, it is noted that this court has had occasion to address the doctrine and has held that it has its limitations. See, Factory Mut. Ins. Co. v. DLR Contracting, Inc., No. 3:04CV834, 2005 WL 2704502, at *5 (E.D. Va. Oct. 20, 2005).  See also, Filak v. George, 594 S.E.2d 610 (Va. 2004), see Barnette, 3:05CV590, at 12-15.

Date:  June 21, 2006
Richmond, Virginia